UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KEVIN B. McCARTHY, et al.,  ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | CAUSE NO. 1:08-cv-994-WTL-DML |
| ) | |
| PATRICIA ANN FULLER, a/k/a SISTER ) | |
| JOSEPH THERESE, et al., ) | |
| ) | |
| Defendants. ) | |

## ENTRY ON MOTION FOR JUDGMENT ON THE PLEADINGS

The Counterclaim Defendants in this cause have filed a Motion for Partial Judgment on the Pleadings (dkt. no. 194) with respect to the Counterclaimants' claims brought pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Indiana Corrupt Business Influence Act ("the Indiana Act"). The motion is fully briefed, and the Court, being duly advised, **GRANTS** the motion for the reasons set forth below.

### I. STANDARD

In reviewing a motion for judgment on the pleadings, the Court must apply the same standard that applies to a motion to dismiss under Rule 12(b)(6). *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). Therefore, the Court must accept as true all well-pleaded facts in the amended counterclaim and draw all possible inferences in favor of the Counterclaimants. *See Lake v. Neal*, 585 F.3d 1059, 1060 (7th Cir. 2009). In other words, the question is whether the moving party is entitled to judgment as a matter of law even assuming that all of the facts are as pled by the nonmoving party.

### II. RELEVANT FACTUAL ALLEGATIONS

The recitation of facts in the Amended Counterclaims is lengthy and detailed. What

follows here is a highly condensed version of those alleged facts that are relevant to, or will aid in the understanding of, the issues addressed herein.

Counterclaimant Patricia Ann Fuller, who is also known as Sister Joseph Therese, entered a convent as a teenager in 1964. There she met Sister Mildred Neuzil. Beginning in the 1940s, and continuing to the time of her death in 2000, Sister Neuzil "received locutions and apparitions from the Lord Jesus Christ, His Blessed Mother Mary (hereinafter 'Blessed Mother'), Saint Joseph, Saint Michael the Archangel, Saint Bernadette, and others." Amended Counterclaims ¶ 27. The Counterclaimants allege that:

> During apparitions, the Blessed Mother imparted a number of messages to [Sister Neuzil], which [she] reduced to writing in the form of a personal diary. In part, the Blessed Mother requested that the citizenry of the United States devote itself to purity of heart. Further, the Blessed Mother requested that an American artist, in the United States, create a statue, in the precise likeness of the Blessed Mother as She appeared to the Visionary, under the title of Our Lady of America, and that such a statue be enthroned in solemn procession at the National Shrine of the Immaculate Conception, Washington, D.C.

*Id.* at 28. Sister Neuzil told Paul Leibold, who was at the time the Archbishop of Cincinnati, Ohio, about the apparitions and messages. Archbishop Leibold commissioned a statue ("the Statue"), a wooden plaque, and religious medallions, all of which depicted the image of Our Lady of America as she had been drawn by Sister Neuzil.

Sister Neuzil compiled the messages she had received regarding Our Lady of America in a 48-page book ("the Diary"). She registered the copyright of the Diary in 1989; she also registered several other copyrights relating to Our Lady of America. Sister Neuzil also founded the Our Lady of America Center in Fostoria, Ohio, "for the purpose of propogating the Devotion to Our Lady of America," and registered the name of the Center as a trade name with the State of Ohio. *Id.* at ¶ 37.

In her will, Sister Neuzil bequeathed all of her possessions to Fuller, including her copyrights. Fuller has owned and operated the Our Lady of America Center since Sister Neuzil's death. Also since that time, Fuller has applied for and been awarded several trademarks for various items relating to Our Lady of America.

On or about November 1, 2005, Counterclaim Defendants Kevin McCarthy and Albert Langsenkamp, along with a priest, visited the Our Lady of America Center and "offered to volunteer their services to [Fuller] and to the Our Lady of America Center, falsely alleging that their purpose was to propagate the Devotion to the Blessed Mother, under the title of Our Lady of America, on behalf of the Our Lady of America Center and [Fuller]." *Id.* at ¶ 45. Their purpose was actually "to unlawfully wrest control of the Devotion to Our Lady of America from [Fuller] and the Center, all for the sake of personal financial gain." *Id.* at ¶ 46. In fact, McCarthy and Langenskamp, along with the other Counterclaim Defendants, the Third-Party Defendants in this case, and others, had joined together in a criminal enterprise ("the Enterprise") for the purpose of perpetrating a scheme that targeted Fuller, who they knew had "for nearly fifty years . . . lived a simple life devoted almost exclusively to prayer, uninvolved with worldly affairs, and . . . would be naive and trusting." *Id.* at ¶ 52.

The members of the Enterprise tricked Fuller into turning over the Statue and several other items related to Our Lady of America (collectively "the Items") to them and then refused to return the Items to Fuller when she asked for them back after discovering that the Counterclaim Defendants were not really working to further the Devotion. In the course of their scheme, the Enterprise also defrauded Fuller out of a substantial sum of her personal funds. In addition, the members of the Enterprise have infringed and continue to infringe Fuller's copyrights and

trademarks relating to Our Lady of America in various ways, including making a website that contains material copied from Fuller's website.

### III. DISCUSSION

The Counterclaim Defendants allege that the amended counterclaim fails as a matter of law to state a claim under either RICO or the Indiana Act. The arguments of the parties are addressed, in turn, below.

#### A. Procedural Arguments

The Counterclaimants make three procedural arguments in opposition to the instant motion. All are without merit.

First, the Counterclaimants argue that "to the extent that the motion is brought under Rule 12(b)(6), it should be denied." Response at 4. Nothing in the motion or brief in support of it can reasonably be construed as suggesting that the motion is brought pursuant to Rule 12(b)(6). It is clearly and unequivocally a motion for judgment on the pleadings brought pursuant to Rule 12(c). The Counterclaim Defendants simply note, correctly, as the Court does above and as the Counterclaimants themselves do in their brief, that the same legal standard is applicable to both types of motions.

Second, the Counterclaimants argue that the instant motion is "barred" by the "application of the law of the case doctrine" because the Court denied as moot a previous motion to dismiss and a motion to strike filed by the Counterclaim Defendants. This argument is, in a word, silly. In the motion to strike the amended counterclaim, the Counterclaim Defendants objected to the manner in which the amended counterclaim was organized; that motion did not raise, and therefore the Court's ruling did not address, the *legal viability* of the claims contained

in the pleading. Indeed, the very premise of the motion to strike was that the Counterclaim Defendants should not have had to address the legal viability of the claims because they were too difficult to discern. And while the previous motion to dismiss did involve the legal viability of the Counterclaimants' claims, that motion was directed to the original, not the amended, counterclaim. The Court denied it as moot because the Counterclaimants had filed their amended counterclaim. Denying the motion as moot simply acknowledged that the motion was no longer viable because it was directed to a pleading–the original counterclaim–that itself was no longer viable, having been superceded by the amended counterclaim. That ruling passed no judgment on the arguments made in the motion to dismiss because the Court never considered those arguments. This means that there was no "law" developed such that the "law of the case" could later be invoked. This basic legal principle should have been obvious to counsel for the Counterclaimants, but in the event it was not, the instruction in the Court's order denying the motion to strike and denying the motion to dismiss as moot that "[i]f the Plaintiffs believe that part or all of the amended counterclaim is subject to dismissal pursuant to Rules 12(b)(6) or 9(b), they should file an appropriately supported motion to dismiss" should certainly have made it clear that the Court's order was in no way intended to foreclose any future motions directed to the legal viability of the amended counterclaim.

Finally, the Counterclaimants argue that if the Court grants the instant motion, that should not lead to dismissal of the implicated claims with prejudice because the Counterclaimants should be given an opportunity to file a second amended counterclaim to address any deficiencies found by the Court. The Counterclaimants are correct that "district courts routinely do not terminate a case at the same time that they grant a defendant's motion to

5

dismiss; rather, they generally dismiss the plaintiff's complaint without prejudice and give the plaintiff at least one opportunity to amend her complaint." *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010). That is because "as a general matter, Rule 15 ordinarily requires that leave to amend be granted at least once when there is a potentially curable problem with the complaint or other pleading. A plaintiff is entitled to amend the complaint once as a matter of right, Fed.R.Civ.P. 15(a), and a court should 'freely give leave for a party to file an amended complaint when justice so requires.'" *Id.* (quoting Fed.R.Civ.P. 15(a)(2)).[1] However, the former rationale does not apply in this case because by the time the instant motion was filed the Counterclaimants did not have a right to amend as a matter of right; first, they already had done so, and second, the Counterclaim Defendants had filed their answer to the amended counterclaim. And justice certainly would not require permitting the Counterclaimants another opportunity to amend their counterclaim at this late stage in the case.

## B. Substantive Arguments

With regard to the substantive arguments made by the Counterclaim Defendants, the Court notes as an initial matter that the Counterclaimants have failed to address them in any coherent way. Rather, other than the procedural arguments addressed above, their response brief consists of a general summary of RICO law that, while fairly thorough and accurate, is not particularly helpful to the Court in the absence of an explanation of how that law should be applied to the facts as alleged in the amended counterclaim. Rather than provide that explanation, the Counterclaimants simply recite some of the paragraphs in the amended

---

[1] The Court notes that recent amendments to Rule 15 might call this rule into question; however, the Court need not address that issue here.

counterclaim. The Court's task, then, is to determine whether the Counterclaim Defendants have demonstrated that entry of judgment on the pleadings with regard to the Counterclaimants' claim under RICO and the Indiana Act is appropriate as a matter of law.

RICO § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c) . "In order to establish a violation of § 1962(c) . . . a plaintiff must show the following four elements by a preponderance of the evidence: '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466, 472 (7th Cir. 2007) (quoting *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)).

The Counterclaim Defendants first argue that the amended counterclaim fails to state a RICO claim because the facts as pled do not support the existence of a RICO "enterprise" because the Enterprise it alleges does not have the requisite "structure" and is not "separate and distinct from the persons sought to be held liable." The problem with the Counterclaim Defendants' argument is that it is based upon the state of the law in the Seventh Circuit prior to the Supreme Court's ruling in *Boyle v. United States*, 556 U.S. 938 (2009). While the Counterclaim Defendants cite to *Boyle* for the general rule that a RICO association-in-fact "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose," 556 U.S. at 946, they fail to acknowledge that *Boyle* established a standard for evaluating the existence of a RICO association-in-fact that is substantially different than that employed by the Seventh Circuit prior to *Boyle*. *See Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*, 610

7

F.3d 382, 388 (7th Cir. 2010) (setting out pre-*Boyle* law and acknowledging that *Boyle* "throws all in doubt").

*Boyle* involved a criminal prosecution for RICO violations. The Supreme Court summarized the facts as follows:

> Petitioner and others participated in a series of bank thefts in New York, New Jersey, Ohio, and Wisconsin during the 1990's. The participants in these crimes included a core group, along with others who were recruited from time to time. Although the participants sometimes attempted bank-vault burglaries and bank robberies, the group usually targeted cash-laden night-deposit boxes, which are often found in banks in retail areas.
>
> Each theft was typically carried out by a group of participants who met beforehand to plan the crime, gather tools (such as crowbars, fishing gaffs, and walkie-talkies), and assign the roles that each participant would play (such as lookout and driver). The participants generally split the proceeds from the thefts. The group was loosely and informally organized. It does not appear to have had a leader or hierarchy; nor does it appear that the participants ever formulated any long-term master plan or agreement.
>
> From 1991 to 1994, the core group was responsible for more than 30 night-deposit-box thefts. By 1994, petitioner had joined the group, and over the next five years, he participated in numerous attempted night-deposit-box thefts and at least two attempted bank-vault burglaries.

*Id.* at 941. The issue before the Supreme Court was whether the following jury instruction was erroneous:

> The term "enterprise" as used in these instructions may also include a group of people associated in fact, even though this association is not recognized as a legal entity. Indeed, an enterprise need not have a name. Thus, an enterprise need not be a formal business entity such as a corporation, but may be merely an informal association of individuals. A group or association of people can be an "enterprise" if, among other requirements, these individuals "associate" together for a purpose of engaging in a course of conduct. Common sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure.
>
> Moreover, you may find an enterprise where an association of individuals, without structural hierarchy, forms solely for the purpose of carrying out a pattern of racketeering acts. Such an association of persons may be established by

8

> evidence showing an ongoing organization, formal or informal, and . . . by evidence that the people making up the association functioned as a continuing unit. Therefore, in order to establish the existence of such an enterprise, the government must prove that: (1) There is an ongoing organization with some sort of framework, formal or informal, for carrying out its objectives; and (2) the various members and associates of the association function as a continuing unit to achieve a common purpose.

*Id.* at 942 n.1. The Supreme Court rejected the petitioner's argument that a RICO enterprise needed more structural features than simply a group of people that joined together to pursue a course of conduct. Rather, the Court held:

> an association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Id.* at 948.

Applying *Boyle* to the facts alleged in the amended counterclaim, the Counterclaimants allege the existence of an Enterprise that had each of the elements of a RICO enterprise: (1) a purpose–"to unlawfully wrest control of the Devotion to Our Lady of America from [Fuller] and the Center, all for the sake of personal financial gain," Amended Counterclaim at ¶ 46; (2) relationships among those associated with the enterprise–the amended counterclaim is replete with allegations that demonstrate the relationships between McCarthy, Langenskamp, Young, and others; and (3) sufficient longevity for the Enterprise to pursue its purpose. Therefore, the

9

Counterclaimants have sufficiently alleged the existence of a RICO enterprise.

However, the Court agrees with the Counterclaim Defendants that the Counterclaimants' RICO claim fails for another reason–the scheme alleged by the Counterclaimants fails to satisfy the "continuity" requirement that is inherent in the "pattern" element of a § 1962(c) claim. "For this element to be satisfied, the alleged acts of wrongdoing must not only be related, but . . . must amount to or pose a threat of continued criminal activity." *Gamboa v. Velez*, 457 F.3d 703 (7th Cir. 2006) (citations omitted).

> This is true whether the misconduct at issue is considered a "close-ended" scheme (a completed scheme that, by its duration, can carry an implicit threat of future harm) or "open-ended" scheme (a scheme that, by its intrinsic (e.g., business-as-usual) nature, threatens repetition and thus future harm). Consequently, isolated instances of criminal behavior, not presenting at least some threat of future harm, cannot meet § 1962(c)'s continuity element.

*Id.* at 705-06 (citations omitted).

In *Gamboa*, the plaintiff alleged that the defendants, a group of detectives, had engaged in a five-year scheme to frame him and four others for a murder. Gamboa alleged that the defendants had engaged in numerous acts of racketeering over a five-year period in order to accomplish their goal. The court held that Gamboa had nonetheless failed to satisfy the continuity requirement because the allegations in his complaint "foreclosed any threat of continued criminal activity."

> Restated, when, as here, a complaint explicitly presents a distinct and non-reoccurring scheme with a built-in termination point and provides no indication that the perpetrators have engaged or will engage in similar misconduct, the complaint does not sufficiently allege continuity for § 1962(c) purposes even if the purported scheme takes several years to unfold, involves a variety of criminal acts, and targets more than one victim. *See Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 662-63 (7th Cir.1992) (failure to state a RICO claim even though defendants' alleged scheme "extended over a period of years," involved multiple fraudulent acts, and injured more than one victim); see also *W. Assocs.*

> *Ltd. P'ship. v. Mkt. Square Assocs.*, 235 F.3d 629, 633-37 (D.C.Cir. 2001) (dismissal of complaint affirmed because alleged scheme, while lasting some eight years, was merely a single effort and thus failed to satisfy the pattern element); *Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 13, 17-21 (1st Cir. 2000) (failure to state a RICO claim-failure to alleged the necessary pattern-because "the acts as alleged comprise a single effort, over a finite period of time"); *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1263, 1265 (D.C. Cir.1995) (dismissal of RICO claim upheld, concluding that, even though the alleged scheme lasted some three years, it was "virtually impossible for plaintiffs to state a RICO claim" where they alleged a single-purpose scheme with a discrete injury suffered by a small number of victims.

*Id.* at 709-710 (additional citations omitted).

The Counterclaim Defendants argue that this case fits within the *Gamboa* box and therefore the Counterclaimants cannot satisfy the continuity element. The Court agrees with the Defendants that the amended counterclaim can, indeed, be read in such a fashion. The Counterclaimants have alleged that the Enterprise engaged in a scheme to "unlawfully wrest control of the Devotion to Our Lady of America . . . for the sake of personal financial gain." Amended Counterclaim at ¶ 46. A fair reading of the amended counterclaim is that all of the actions that the Enterprise is alleged to have taken were done in furtherance of or in conjunction with the scheme to take control of the Devotion from Fuller so that they could financially benefit from it. There is nothing about the allegations in the amended counterclaim that suggests that the Enterprise will move on (or would have moved on, absent this lawsuit) to another scheme when it is finished reaping the benefits of this one. Therefore, as in *Gamboa*, the amended counterclaim in this case "presents a distinct and non-reoccuring scheme with a built-in termination point and provides no indication that the perpetrators have engaged or will engage in similar misconduct." *See Gamboa*, 457 F.3d at 709. Therefore, the continuity requirement is not satisfied in this case.

11

There may well be arguments that could be made regarding the allegations in this case that might lead to a different conclusion. The Counterclaimants have not made them, however, and the Court is not in a position to make them on their behalf. *See Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011) ("[I]t is not this court's responsibility to research and construct the parties' arguments.") (citation omitted). As noted above, all the Counterclaimants have done in response to the instant motion is provide a summary of RICO law and quoted paragraphs from the amended counterclaim. The quoted paragraphs do contain allegations that the Counterclaim Defendants' wrongdoing is continuing in that content remains on their website that infringes Fuller's copyrights and trademarks. However, the paragraphs in question suggest only that the Enterprise copied Fuller's website and used her website content to create their own website. The act of infringement, therefore, was the copying of the website; the fact that the copied information remains available on the internet may be relevant to the calculation of damages in an action for copyright infringement, but it does not mean that the Enterprise has continued to engage in additional acts of criminal copyright infringement, nor does it mean that there is a threat that they will commit additional criminal acts in the future. Accordingly, the Court agrees with the Counterclaim Defendants that the allegations contained in the amended counterclaims do not satisfy the continuity requirement necessary to sustain a claim under § 1962(c).

The Counterclaimants also assert a RICO conspiracy claim under 18 U.S.C. § 1962(d). The Counterclaim Defendants argue, and the Court agrees, that this claim fails for the same reason as the § 1962(c) claim does.[2] So, too, does the Counterclaimants' claim under the Indiana

---

[2] "In order to state a claim for § 1962(d) conspiracy, a plaintiff must allege that (1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011) (citations omitted). Obviously, a RICO conspiracy claim can, under some circumstances, survive in a case in which a § 1962(c) claim

Act. As the Counterclaimants concede in their response, "[w]hile the Indiana statutes are not as identical to the Federal RICO laws as the Movants suggest, the differences and nuances are not material at this time for resolution of the Motion for Judgment on the Pleadings." Response at 20.

## IV. CONCLUSION

For the reasons set forth above, the Counterclaim Defendants' motion for judgment on the pleadings on all of the Counterclaimants' claims pursuant to RICO and the Indiana Act is **GRANTED**.

SO ORDERED: 5/2/12

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

---

fails. *See, e.g., Gagan v. American Cablevision, Inc.*, 77 F.3d 951 (7th Cir. 1996). In this case, however, the Counterclaimants do not allege that the Counterclaim Defendants conspired to commit any activities other than the ones they allegedly actually committed, and those activities, for the reasons discussed above, do not satisfy the continuity requirement and therefore do not qualify as a "pattern of racketeering activity."

**Copy by United States Mail to:**

**LARRY YOUNG
P.O. Box 996
Lake Zurich, IL 60047**

Copies to all counsel of record via electronic notification